IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Catina Bryant, | ) | C/A No.: 1:13-1994-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On July 12, 2010, Plaintiff filed an application for DIB in which she alleged her disability began on June 16, 2008. Tr. at 168–71. Her application was denied initially and upon reconsideration. Tr. at 74, 76. On March 19, 2012, Plaintiff had a hearing

before Administrative Law Judge ("ALJ") Augustus C. Martin.  Tr. at 32–73 (Hr'g Tr.).

At the hearing, Plaintiff amended her alleged onset date to January 31, 2009.  Tr. at 12,

36.  The ALJ issued an unfavorable decision on March 30, 2012, finding that Plaintiff

was not disabled within the meaning of the Act.  Tr. at 12–24.  Subsequently, the Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final

decision of the Commissioner for purposes of judicial review.  Tr. at 1–4.  Thereafter,

Plaintiff brought this action seeking judicial review of the Commissioner's decision in a

complaint filed on July 19, 2013.  [Entry #1].

 B. Plaintiff's Background and Medical History

  1. Background

Plaintiff was 38 years old at the time of the hearing.  Tr. at 32, 168.  She

completed high school.  Tr. at 38.  Her past relevant work ("PRW") was as a cashier,

weight reduction specialist, inventory clerk, collection clerk, hospital cleaner, machine

operator, nurse assistant, short order cook, housekeeper, and carpet sewing machine

operator.  Tr. at 61.  She alleges she has been unable to work since January 31, 2009.  Tr.

at 36.

  2. Medical History

On June 18, 2008, Plaintiff presented to the Roper St. Francis emergency room

("ER") after a car accident in which her car was rear-ended by another vehicle while she

was at a stop sign.  Tr. at 343.  The overall examination of her left shoulder and scapula

was consistent with a mild to moderate sprain/strain.  Tr. at 344.  Plaintiff was discharged

home and advised to follow up with her primary care provider.  Tr. at 345.

The following day, Plaintiff presented to her primary doctor, Rose Delores Gibbs, M.D. Tr. at 412. Plaintiff complained of posterior neck and mid-back pain. *Id.* X-rays taken on July 3, 2008, showed possible spondylolysis of the lower back and a retrolisthesis of C2 versus C3. Tr. at 340–41. On July 17, 2008, Dr. Gibbs referred Plaintiff to physical therapy. Tr. at 411. She underwent physical therapy from July 29, 2008, through December 17, 2008, completing 45 visits for neck and back pain. Tr. at 311–39.

On September 5, 2008, Plaintiff complained to Dr. Gibbs of cramps in her back and stated that her legs, feet, and hands were tingling. Tr. at 410. On September 18, 2008, Dr. Gibbs noted that Plaintiff was on leave from work for three weeks to complete physical therapy. Tr. at 409. On October 2, 2008, Plaintiff's provider observed that her muscles were weaker than normal, her legs had decreased strength bilaterally, and she was tender to moderate palpation from her left sternocladum to her sternum. Tr. at 408. However, she had full range of motion in her neck, elbows, shoulders, and spine, and her paraspinal muscles were only mildly tender. *Id.*

An MRI of Plaintiff's lumbar spine from October 7, 2008, revealed mild degenerative changes, including mild broad-based disc bulges at L4–5 and L5–S1. Tr. at 307. On October 16, 2008, Dr. Gibbs referred Plaintiff to a spine doctor for an epidural injection. Tr. at 406. On October 30, 2008, Plaintiff reported shoulder, neck, and back pain with muscle spasms. Tr. at 405. She also reported that certain physical therapy appointments made her pain worse. *Id.* She was taking Lexapro and Lyrica. *Id.*

On November 3, 2008, Plaintiff saw Don Stovall Jr., M.D., at Lowcountry Orthopaedics and Sports Medicine and complained of moderate aching pain in her lower lumbar spine, some numbness and tingling in her hands and feet, and moderate aching pain in the cervical spine associated with some headaches. Tr. at 433. On examination, Plaintiff had limited rotation of her cervical spine and mild tenderness and limited flexibility of the lumbosacral junction. Tr. at 432. Examination of Plaintiff's upper and lower extremities revealed full range of motion, normal muscle strength and tone, and no edema, atrophy, or skin changes. *Id.*

On November 18, 2008, a cervical MRI demonstrated that Plaintiff had mild, multi-level, broad-based disc bulges with no neural contact or impingement. Tr. at 309.

On November 20, 2008, Dr. Stovall recommended a continuation of physical therapy for Plaintiff's neck and lower back, but noted that there were no indications for operative intervention. Tr. at 430. The doctor also noted that Plaintiff would be available for modified work duty. Tr. at 431.

On December 22, 2008, Plaintiff had finished physical therapy and continued to have some neck, shoulder, and lower back pain, but no upper extremity symptoms. Tr. at 430. She reported numbness and tingling in her arms, hands, and feet. *Id.* Dr. Stovall recommended continued conservative care and referred Plaintiff to Shailesh M. Patel, M.D., for a possible cervical epidural steroid injection. *Id.*

At appointments in January 2009, February 2010, June 2010, and July 2010, Dr. Patel found that Plaintiff had a slight cervical tilt to the left; some tenderness to palpation in her cervical and lumbar paraspinals; tenderness over her trapezius, rhomboids, and

levator scapulae; and a positive straight leg raising test at 45 degrees bilaterally. Tr. at 422, 424, 426, 428. The doctor also observed at these appointments that Plaintiff was in no acute distress, she was alert and oriented to four spheres, her mood and affect were appropriate, she had normal range of motion in her cervical and lumbar spines, her sensation was intact in her upper and lower extremities, and her strength was rated as 5/5 in her upper and lower extremities bilaterally. Tr. at 422, 424, 426, 428. Dr. Patel diagnosed Plaintiff with lumbar and cervical disc bulges, cervical dystonia, and bilateral lumbar and cervical radiculitis. Tr. at 422, 424–25, 428.

On January 8, 2009, Plaintiff reported that she was still weak and experiencing tingling in her hands and upper legs. Tr. at 404. She said she had more frequent headaches and that the headaches had started one month after her accident, but had gradually worsened. *Id.* She reported nausea, vomiting, and being off balance at different times. *Id.* On January 12, 2009, Plaintiff reported falling as she was getting off the commode. Tr. at 403.

Plaintiff received an epidural steroid injection at C7–T1 on January 29, 2010. Tr. at 434. On February 10, 2010, Plaintiff reported 75% improvement after the injection for one week, and then 50% improvement. Tr. at 426. She reported continued moderate aching pain in her lower back with radiation into both lower extremities. *Id.* Dr. Patel noted that Plaintiff's EMG/NCS test revealed that there was no evidence of peripheral neuropathy, chronic cervical radiculopathy, or focal nerve entrapment in either of her upper extremities. Tr. at 425, 445–48. He advised Plaintiff that because it had been so long since her date of injury, some of her symptoms might be chronic, particularly the

myofascial symptoms in her neck and upper shoulder blades.  Tr. at 425.  Before proceeding with another injection, Dr. Patel wanted Plaintiff to try some noninterventional methods of pain management including a TENS unit and a traction unit.  *Id.*

On July 20, 2010, Plaintiff reported continued moderate neck and lower back pain.  Tr. at 423.  Dr. Patel noted that Plaintiff's pain medicines, TENS unit, and traction unit were providing good relief.  *Id.*  He further noted that an EMG/NCS study performed that day demonstrated no evidence of chronic radiculopathy in either lower extremity.  Tr. at 422.  He scheduled Plaintiff for an epidural steroid injection in her lower back, but recommended continued conservative treatment for her neck and upper extremity symptoms.  *Id.*  Dr. Patel concluded that Plaintiff could return to work, but she could only occasionally climb, bend, or stoop, and she could only lift up to 15 pounds.  Tr. at 449.  He found that Plaintiff had not reached maximum medical improvement.  *Id.*

In August 2010, state-agency physician Angela Saito opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand and/or walk and sit for about six hours each in an eight-hour day.  Tr. at 451–57.  The doctor further opined that Plaintiff could occasionally use hand and foot controls with her upper and lower extremities bilaterally; never climb ladders, ropes, or scaffolds; occasionally engage in other postural activities; and occasionally reach overhead bilaterally.  Tr. at 451–53.  He found that she should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation;

and should avoid even moderate exposure to hazards.  Tr. at 454.  On April 18, 2011, state-agency physician Matthew Fox concurred with Dr. Saito's opinions.  Tr. at 485–92.

In October 2010, Plaintiff was referred for a psychological consultative examination with E.G. Schleimer, Ph.D.  Tr. at 458–59.  The doctor noted that Plaintiff's mood seemed to be chronically depressed and that Plaintiff had partial insights and thoughts of suicide.  Tr. at 458.  Dr. Schleimer observed that Plaintiff's affect was appropriate, she was oriented to four spheres, there was no notable anxiety at the interview, and her social judgment was intact.  *Id.*  Dr. Schleimer further observed that Plaintiff's attention and concentration skills were in the normal range, she performed calculations quickly, she was able to abstract proverbs, her intellect appeared normal clinically, and her WRAT scores were at high school level.  *Id.*  The doctor found that Plaintiff had dysthymic disorder and panic disorder and that her Global Assessment of Functioning ("GAF")[1] score was 65.  Tr. at 459.  He recommended behavior therapy for the panic disorder with a qualified professional.  *Id.*

Also in October 2010, state-agency physician Dr. Michael Neboschick opined that due to her depression, dysthymic disorder, and panic disorder, Plaintiff had mild restriction of activities of daily living ("ADLs"); mild difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and had experienced no episodes of decompensation of an extended duration.  Tr. at 463–70.  He further opined that she could perform simple tasks for at

---

[1] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

least two-hour periods; would occasionally miss a day of work secondary to her symptoms; would have difficulty working in close proximity or coordination with co-workers; was best suited for a job that did not require continuous interaction with the general public; could perform single, repetitive tasks without special supervision; and could attend work regularly and accept supervisory feedback. Tr. at 476.

On February 4, 2011, Plaintiff received a right C7–T1 translaminar epidural steroid injection. Tr. at 483. On February 17, 2011, Plaintiff reported improvement in her neck pain, but she still had moderate tenderness to palpation in the cervical paraspinals. Tr. at 482. Her right shoulder continued to bother her and her range of motion was limited in abduction and flexion. *Id.* Upper extremity testing was positive for impingement sign on the right shoulder. *Id.* She was diagnosed with right rotator cuff tendinitis and continued on Neurontin and Flexeril. *Id.* Dr. Patel indicated that Plaintiff could continue working in modified duty with occasional climbing, bending, and stooping, and no lifting over 15 pounds. Tr. at 481–82.

On July 5, 2011, Timothy M. Zgleszewski, M.D., of Palmetto Spine and Sports Medicine conducted an independent medical examination. Tr. at 493–97. On examination, the doctor found that Plaintiff was in a moderate to severe amount of pain, she had painful range of motion in her cervical and lumbar spines and tenderness and spasms in her lumbar and cervical paraspinals bilaterally; she was tender over her lumbar facets, posterior superior iliac spine (PSIS), and cervical facet joints bilaterally; and her Patrick's test was positive. Tr. at 494. Dr. Zgleszewski also observed, however, that Plaintiff was alert and oriented to three spheres, her gait was non-antalgic, her hip range

of motion was normal, she had no generalized tenderness over her greater trochanters, her straight leg raising was negative bilaterally, her upper and lower extremity motor and sensory examinations were normal, she had no trigger points in her cervical spine, and the neural tension signs in her arms and legs were negative. *Id.* The doctor diagnosed Plaintiff with cervical spondylosis, probable cervical facet joint dysfunction, lumbar spondylosis, and lumbar facet joint pain and/or bilateral SI joint dysfunction. Tr. at 495. He found that she was not at maximum medical improvement, was a candidate for PENS treatment, and would require oral pain medication to control her neck and low back pain. Tr. at 495–96. Dr. Zgleszewski concluded that Plaintiff could return to sedentary work, lifting up to 10 pounds occasionally. Tr. at 496. He found that she could not do the following: perform continuous standing and walking that exceeded 50% of her work time; crawl, kneel, or be in a cramped position; reach above shoulder height; engage in repeated/repetitive stooping, bending, or squatting; sit continuously; work on ladders or at exposed heights; or engage in frequent or repeated stair climbing. *Id.*

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on March 19, 2012, Plaintiff testified that she had a driver's license and was able to drive. Tr. at 38. She stated that she used a cane, but it was not prescribed by a doctor. Tr. at 39. She said that she had discs in her neck and back that pressed on her nerves causing tingling and numbness in her hands and feet; she had sharp pains that shot through her body; and she had pain in her hips when she walked for a

distance.  Tr. at 44.  She stated that she also had migraine headaches that lasted for three days.  *Id.*

Plaintiff reported that she could not sit or stand for long periods and that, if she sat for a long period, she would experience numbness and tingling in her legs.  Tr. at 45.  She said constant lifting hurt her shoulder; she had pain in her lower back, hips, and neck; and her pain generally averaged a six or seven out of 10, but was an eight on her worst days.  Tr. at 45–46.  She stated that she was taking Neurontin, Flexeril, and Mobic for her pain; that she had a TENS unit and a back brace; and that medication and sleep helped her pain.  Tr. at 46.  Plaintiff testified that her condition had gotten a little worse over time, that her migraines were more frequent, and that she isolated herself and cried more frequently.  Tr. at 47.  With regard to her emotional problems, she said she was not taking any medications and had never been hospitalized, but had attended an initial intake meeting for counseling.  Tr. at 47–48.

Plaintiff reported getting up at 11:30 or 12:00, talking to her mother, watching television, checking her email, and reading.  Tr. at 49.  She said she could not cook or do housework, but could take care of her personal needs and sometimes went shopping.  Tr. at 50.  She reported that she was enrolled in an online degree program through Liberty University and had taken 13 courses since January 2009.  Tr. at 50–51.  She stated that she failed two of the courses and was working at a slow pace because she could not sit up for long periods.  Tr. at 51.

### b.    Testimony of Plaintiff's Mother

Priscilla Bryant, Plaintiff's mother, testified that Plaintiff did not do any work around the house, frequently fell down, and was often unable to drive.  Tr. at 57.  Ms. Bryant stated that Plaintiff used her cane all of the time, but seldom left the house and had no friends.  Tr. at 58–59.

### c.    Vocational Expert Testimony

Vocational Expert ("VE") Kristan Cicero reviewed the record and testified at the hearing.  Tr. at 60.  The VE categorized Plaintiff's PRW as a cashier as unskilled, light work; as a weight reduction specialist as semi-skilled, light work (medium as performed); as an inventory clerk as semi-skilled, medium work (heavy as performed); as a collection clerk as semi-skilled, sedentary work; as a hospital cleaner as unskilled, medium work; as a machine operator as skilled, medium work (heavy as performed); as a nurse assistant as semi-skilled, medium work; as a short order cook as semi-skilled, light work; as a housekeeper as unskilled, light work; and as a carpet sewing machine operator as semi-skilled, medium work.  Tr. at 61.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with the following restrictions: occasionally use hand controls bilaterally with the upper extremities; occasionally use foot controls bilaterally with the lower extremities; never climb ladders, ropes, or scaffolds; occasionally perform other postural movements; avoid concentrated exposure to extreme temperatures, humidity, and respiratory irritants; avoid even moderate exposure to hazards; and do simple, routine, repetitive tasks with no more than occasional contact with co-workers or the general public.  Tr. at 61.  The VE testified that

the hypothetical individual could not perform Plaintiff's PRW.  *Id.*  The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform.  *Id.*  The VE identified the jobs of packager, garment folder, and bagger.  Tr. at 62–63.  The ALJ then further limited the hypothetical individual to sedentary work with the ability to alternate positions every 45 minutes to an hour.  Tr. at 63.  The VE testified that the individual could perform the jobs of inspector, assembler, and lens inserter; however, the VE reduced the number of available jobs by approximately 75 percent because of the sit-stand option.  *Id.*  The VE stated that if the hypothetical individual was further limited to occasional fine and gross manipulation with the bilateral upper extremities, there would be no sedentary jobs available.  Tr. at 64.

Upon questioning by Plaintiff's counsel, the VE stated that if the hypothetical individual consistently missed two or more days of work per month, she would not be able to maintain employment in most positions.  Tr. at 65.  The VE testified that all jobs would be eliminated if the individual would be off task one third or one fourth of the day due to pain.  Tr. at 65–66.

2.    The ALJ's Findings

In his decision dated March 30, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.
2.    The claimant has not engaged in substantial gainful activity since January 31, 2009, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine, asthma, headaches, depression and panic disorder (20 CFR 404.1520(c)).

12

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). Specifically, the claimant can lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. However, the claimant can only occasionally use hand controls bilaterally with the upper extremities and occasionally use foot controls bilaterally with the lower extremities. She cannot climb ladders, ropes or scaffolds, and she can only occasionally perform other postural movements. The claimant must avoid concentrated exposure to extreme temperatures, humidity and respiratory irritants, and she must avoid even moderate exposure to hazards. Additionally, the claimant can perform simple, routine and repetitive tasks involving no more than occasional contact with coworkers or the general public. She also requires the option to alternate positions every 45 minutes to 1 hour.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on March 31, 1973 and was 35 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2009, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 14–23.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not adequately explain his RFC determination; and

2)    the ALJ did not properly evaluate Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

16

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.     Analysis

        1.     Credibility

Plaintiff contends that the ALJ failed to perform a proper credibility analysis. [Entry #21 at 26–31]. Specifically, Plaintiff contends that the ALJ relied too heavily on her ADLs, selectively cited to the medical evidence, and placed undue weight on her use of a cane. *Id.* at 28–30. The Commissioner responds that the ALJ properly evaluated Plaintiff's subjective complaints. [Entry #23 at 16–21].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity,

17

persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, ¶ 5.  In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage,

18

effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not fully credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC.  Tr. at 21.

In discounting Plaintiff's credibility, the ALJ first found that the objective medical evidence of record did not support Plaintiff's allegations of disabling symptoms.  Tr. at 18.  The ALJ noted that MRIs from October and November 2008 revealed only mild degenerative changes; February 2010 EMG studies of Plaintiff's extremities were normal and revealed no evidence of peripheral neuropathy; a July 2010 EMG study revealed no evidence of chronic radiculopathy in either lower extremity; and numerous treatment notes reflected normal motor strength and range of motion in Plaintiff's extremities and spine. Tr. at 18–19.  The ALJ also noted that Plaintiff underwent conservative treatment for her alleged physical impairments and reported that medications, injections, a TENS

unit, and a traction unit provided some relief.  Tr. at 19–20.  With regard to Plaintiff's alleged mental impairments, the ALJ found the record to be devoid of any evidence showing Plaintiff had ever been hospitalized or received formal mental health treatment. Tr. at 20.

In making his credibility determination, the ALJ did not rely solely on the lack of objective evidence.  As he is required to do, he cited additional reasons why Plaintiff's testimony was not credible.  *Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994).  He noted that the extent of Plaintiff's ADLs suggested that her symptoms were not as limiting as she alleged.  Specifically, the ALJ cited to Plaintiff's reports that she drove, watched television, used a computer, sent emails, attempted to read, independently cared for herself, occasionally shopped, and took online college courses.  Tr. at 21.  The ALJ also noted that she used a cane that was not medically prescribed, but none of her doctors documented that Plaintiff used a cane and the records indicated that she ambulated with a non-antalgic gait.  *Id.*

While Plaintiff asserts that the ALJ "focused entirely" on her ADLs, the foregoing summary of the ALJ's analysis belies that argument.  Plaintiff also contends that the ALJ selectively cited to the medical records in finding that the objective record does not support Plaintiff's allegations of disabling symptoms.  However, Plaintiff fails to cite to any records that are missing from the ALJ's analysis, and the undersigned's review of the record demonstrates that the ALJ provided an accurate summary.  Finally, Plaintiff asserts that the absence of any mention of a cane in the medical records is explained by her testimony that she recently started using the cane.  This argument is unavailing

because it fails to explain the contradiction between Plaintiff's use of a cane and the medical records indicating she had a non-antalgic gate.

In his credibility determination, the ALJ considered the objective medical evidence, Plaintiff's ADLs, the effectiveness of her treatment, and the conservative nature of her treatment. These are all factors set forth in SSR 96-7p. Because the ALJ properly evaluated Plaintiff's credibility in accordance with SSR 96-7p, the undersigned recommends finding that the credibility determination is supported by substantial evidence.

### 2. RFC Determination

Plaintiff also argues that the ALJ conducted an improper RFC determination because he did not adequately account for Plaintiff's manipulative restrictions and migraine headaches, and did not adequately define the sit-stand option he incorporated into Plaintiff's RFC. [Entry #21 at 19–26]. The Commissioner responds that the RFC determination is supported by substantial evidence. [Entry #23 at 9–16].

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96–8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

a.     Manipulative Limitations

Plaintiff asserts that the ALJ's findings regarding her ability to use her hands was contradictory and should have included a restriction on her ability to engage in fine and gross manipulation.  [Entry #21 at 19–21].  The ALJ limited Plaintiff to occasional use of hand controls bilaterally, but did not place any additional restrictions on the use of her hands for fine or gross manipulation.  Plaintiff contends that the use of hand controls is a specific manipulative activity and, if she is limited in that regard, then she must also be limited in her ability to perform other manipulative tasks.  *Id.* at 20–21.  The Commissioner contends Plaintiff has failed to present any evidence that she had any restrictions in her fine and gross manipulation beyond what the ALJ imposed.  [Entry #23 at 10].

In his decision, the ALJ stated that he considered Plaintiff's cervical degenerative disc disease in restricting her use of hand controls bilaterally and her ability to lift and carry.  Tr. at 20.  He noted, however, that Plaintiff's relatively conservative and sporadic treatment for the condition and the generally mild clinical findings suggested that she retained abilities consistent with the assessed RFC.  *Id.*  Prior to making this finding, the ALJ cited to specific medical records including a November 2008 MRI revealing only mild degenerative changes; a January 2009 physical examination revealing some tenderness, but a full range of motion in the cervical spine; a February 2010 record documenting Plaintiff's report of 75% improvement of pain following an epidural steroid injection and revealing some tenderness of the cervical spine, but normal range of motion and full strength in the upper extremities; a February 2010 EMG study with normal

results and no evidence of peripheral neuropathy, chronic cervical radiculopathy, or focal nerve entrapment in the upper extremities; records in which Plaintiff reported improvement with medications and injections; and a July 2011 record documenting normal motor strength, sensory examination, and deep tendon reflexes of the bilateral upper extremities. Tr. at 19–20.

Based on the medical evidence of record, it appears that the ALJ was giving Plaintiff the benefit of the doubt when he restricted her to only occasional use of the bilateral upper extremities for hand controls. Plaintiff has failed to identify evidence to support a restriction of her ability to engage in fine and gross manipulation. The ALJ gave specific reasons for his RFC findings on this issue. For these reasons, the undersigned recommends finding that the ALJ did not err in failing to include additional manipulation restrictions in his RFC assessment.

b.    Migraine Headaches

Plaintiff next asserts that the ALJ erred in failing to provide any discussion regarding how her alleged migraine headaches impacted her RFC. [Entry #21 at 24–26]. As evidence of this condition, she points only to the ALJ's finding that her headaches constituted a severe impairment and to her own testimony that she was having headaches more frequently and that they would last up to three days. *Id.* at 24.

Plaintiff appears to concede that whether the ALJ erred turns on her credibility, and a majority of her argument addresses the ALJ's credibility finding. *Id.* at 24–25. Based on the undersigned's conclusion that the ALJ's credibility determination is supported by substantial evidence, the undersigned finds that Plaintiff's testimony is

insufficient to establish error by the ALJ. While the medical evidence includes a reference to "some headaches" in November 2008 and more frequent and worsening headaches in January 2009 (Tr. at 404, 433), there is no other mention of headaches and no evidence to corroborate Plaintiff's claim that her headaches lasted up to three days. The burden of proof and production rests on Plaintiff to show limitations. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (noting burden of proof and production is on claimant at steps one through four of the sequential evaluation). For these reasons, the undersigned recommends a finding that any error by the ALJ in failing to address Plaintiff's alleged migraine headaches was harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

c.      Sit/Stand Option

Plaintiff claims that the sit-stand option in the ALJ's RFC determination is inadequately defined, and thus, fails to allow a determination of whether she can work. [Entry #21 at 21]. She asserts that SSR 96-9p required the ALJ to include in his RFC determination the frequency that she needed to alternate between sitting and standing and the amount of time that she could remain in each position. *Id.* at 21–22. The Commissioner responds that the ALJ adequately defined the sit-stand option in his RFC determination. [Entry #23 at 12].

In pertinent part, SSR 96-9p provides as follows:

> **Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p, 1996 WL 374185, at *7.

Plaintiff contends that SSR 96-9p required the ALJ to specify the length of time she would need to stand or walk before returning to a seated position. [Entry #21 at 21–22]. The Commissioner responds that the ruling mandates only that the RFC determination specify how frequently Plaintiff needs to alternate between sitting and standing. [Entry #23 at 12]. In his RFC assessment, the ALJ concluded that Plaintiff could sit for six hours in an eight-hour day, and stand and walk occasionally, but needed the option to alternate positions every 45 to 60 minutes. Tr. at 17. The ALJ specified the frequency with which Plaintiff would need to alternate positions, but did not specify the length of time she would need to stand or walk before returning to a seated position.

A plain reading of SSR 96-9p reveals that the ruling only requires the RFC assessment to specify "the frequency of the individual's need to alternate sitting and standing." Although the ruling provides that the occupational base may be eroded by the length of time the claimant needs to stand, it does not mandate that such information be

included in the RFC assessment.[4]  SSR 96-9p also states that a vocational resource may be useful in matters involving a sit-stand option.  Here, the ALJ consulted with a VE, thereby strengthening the finding that there were jobs in the national and regional economies that Plaintiff could perform with a sit-stand option.

Plaintiff also asserts that the ALJ's RFC assessment failed to reflect the limitations opined by Drs. Patel and Zgleszewski.  [Entry #21 at 22].  Neither doctor's opinion, however, contradicts the ALJ's RFC determination.  Dr. Patel concluded in July 2010 and February 2011 that Plaintiff could return to work that did not require more than occasional climbing, bending, or stooping, or lifting more than 15 pounds.  Tr. at 449, 481.  The ALJ followed the doctor's restrictions, as he found that Plaintiff had the RFC to lift and carry up to 10 pounds occasionally and lesser amounts frequently, and could occasionally perform postural movements, but never climb ladders, ropes, or scaffolds.  Tr. at 17.  Dr. Patel did not impose any restrictions on Plaintiff's ability to sit, stand, or walk.  Tr. at 449, 481.  Thus, there was no inconsistency between the doctor's assessment and the ALJ's RFC determination.

---

[4] The undersigned notes that SSR 96-9p has been interpreted as requiring the ALJ to include the length of time a claimant must stand in exercising a sit-stand option.  *See Sumter v. Colvin*, C/A No. 5:12-2223-RMG, 2014 WL 508365, at *5 (D.S.C. Feb. 6, 2014) (holding that ALJ's finding that claimant would need to alternate sitting and standing every hour was deficient because it did not reference the length of time the claimant would need to stand).  However, the ruling itself appears to mandate only a requirement of specificity with regard to the frequency of alternating positions.  *See Proctor v. Astrue*, C/A No. 5:11-311, 2012 WL 3843959, at *2 (D.S.C. Sept. 5, 2012) ("Social Security Ruling 96-9p states, that the RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.").

In July 2011, Dr. Zgleszewski opined that Plaintiff could return to sedentary work that did not require continuous sitting, or continuous standing or walking that exceeded 50% of the work time. Tr. at 496. This assessment is also consistent with the ALJ's RFC finding, as the doctor did not conclude that Plaintiff could not sit for prolonged periods as Plaintiff alleges, but rather that she could not sit continuously. Tr. at 496. That limitation is accounted for in the ALJ's decision because the RFC determination provides that Plaintiff must be able to alternate positions every 45 to 60 minutes. Tr. at 17. Further, the ALJ limited Plaintiff to occasional standing and walking (Tr. at 17), which is consistent with Dr. Zgleszewski's opinion that she could stand or walk up to four hours in a workday. Tr. at 496; *see also* SSR 83-10, 1983 WL 31251, at *5 ("'Occasionally' means occurring from very little up to one third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than 2 hours of an 8-hour workday.").

Based on the foregoing, the undersigned recommends finding that the ALJ did not err in his description of the sit-stand option. While additional explanation would be preferable, SSR 96-9p does not specifically require it and the ALJ's finding of non-disability is supported by the VE's testimony.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

July 1, 2014                              Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).